**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

WESLEY DALE BOGGS,             )
                                    )
            Plaintiff,         )
                                    )
            v.               )      Civil Action No. 13-1229
                                    )      Judge Nora Barry Fischer
CAROLYN W. COLVIN,           )
Commissioner of Social Security,   )
                                    )
           Defendant.     )

## MEMORANDUM OPINION

### I.   INTRODUCTION

Wesley D. Boggs ("Plaintiff"), brings this action pursuant to 42 U.S.C. § 405(g) and U.S.C. § 1383(c)(3), seeking review of the final determination of the Commissioner of Social ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-403 ("the Act"). This matter comes before the Court on cross motions for summary judgment. (Docket Nos. 12, 16). For the following reasons, Plaintiff's Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment is granted.

### II.   PROCEDURAL HISTORY

Plaintiff applied for DIB on November 3, 2010, alleging a disability onset date of April 30, 2005. (R. at 120).[1] On December 10, 2010, Plaintiff amended his alleged disability onset date to September 1, 2005. (R. at 124). He alleged "spinal fusions with complications" as his disabling impairment. (R. at 154). Plaintiff's claim was denied on December 9, 2010. (R. at

---

[1]      Citations to Docket Nos. 6 - 1: 6 - 17, the Record, *hereinafter*, "R. at _."

74).  He requested a hearing before an Administrative Law Judge ("ALJ") which was held before ALJ Joanna Papazekos on April 20, 2012.  (R. at 33-59, 72, 79).

The ALJ denied Plaintiff's claim for DIB in a decision dated May 15, 2012.  (R. at 15-25).  Plaintiff's request for review of the ALJ's decision by the Appeals Council was denied on June 25, 2013, at which time the ALJ's decision became the final decision of the Commissioner.  (R. at 1, 8).  Plaintiff filed a Complaint in this Court on August 27, 2013.  (Docket No. 3).  Defendant filed an Answer on November 15, 2013.  (Docket No. 5).  On January 15, 2014, Plaintiff filed a Motion for Summary Judgment and a Brief in Support.  (Docket Nos. 12, 13).  Defendant's Motion for Summary Judgment and Brief in Support were filed on March 3, 2014.  (Docket No. 16).  This matter has been fully briefed and is ripe for disposition.

## III.  STATEMENT OF FACTS

### A.  General Background

Plaintiff was born on November 11, 1967 and was forty-four years old[2] at the time of the hearing.  (R. at 37).  Plaintiff was involved in a car accident in 2004, after which he complained of pain in his back and neck.  (R. at 270, 300, 317).  He underwent surgery on September 27, 2005 to repair injuries to his lumbar spine.  (R. at 306, 457).  On October 28, 2005, Plaintiff underwent a second procedure to remove damaged hardware installed during the first surgery.  (R. at 449).  Plaintiff told his physicians that he was involved in a second car accident in 2008 and was further injured.  (R. at 993).   He alleged during the hearing that he was constantly in pain but was able to find some relief while sitting in a reclining chair.  (R. at 45).

### B.  Employment History

---

[2]    The regulations define "Younger Person" as a person who is less than 50 years of age. 20 C.F.R. §§ 404.1563, 416.963.

Plaintiff worked as a manager for an insurance restoration service from 1990 to 1999, where he painted and hung drywall (heavy, skilled work). (R. at 55). Although Plaintiff initially testified that he had not worked since his alleged onset date of September 1, 2005, Plaintiff admitted to working as a secretary for three to four hours a day in 2008. (R. at 39). He was fired from this position after less than a year for being unqualified. (R. at 40).

## C. History of Medical Treatment

### i. Dr. Gerald Werries, M.D.

Plaintiff was treated by Gerald J. Werries, M.D., an orthopedic surgeon, from 2004 to 2009. (R. at 518, 1029). At his first visit with Dr. Werries on May 12, 2004, Plaintiff explained that he had been rear-ended by another driver and was suffering from low back pain and muscle spasms. (R. at 522). He denied leg pain or weakness and rated his pain between four and eight on a scale of ten. (*Id.*). Overhead activity and standing exacerbated his symptoms but they were relieved by physical therapy, stretching exercises, steroids, and pain medication. (R. at 522). Plaintiff was able to return to his job with duty restrictions. (*Id.*). Dr. Werries noted that an MRI showed mild degenerative disc disease. (R. at 523). When he returned on July 7, 2004, Plaintiff reported that his symptoms had improved but he suffered low back spasms after standing for longer than one hour at work. (R. at 520). Dr. Werries recommended trigger point injections of his neck and lower back. (R. at 521). He was placed on a modified work duty regime of standing for no longer than one hour at work. (*Id.*).

Plaintiff told Dr. Werries on September 22, 2004 that his back pain had improved since his last visit and he felt great. (R. at 518). He still suffered from intermittent back pain which he rated between two and three out of ten. (*Id.*). Back injections which he started receiving that month had significantly reduced his pain. (R. at 324, 518). He was instructed to continue the

pain clinic injections and physical therapy exercises. (*Id.*). Plaintiff returned to Dr. Werries on December 8, 2004 reporting significant pain reduction. (R. at 220). He was very pleased with his results but continued to have pain in his neck and shoulder. (*Id.*).

He reported on February 9, 2005 that physical therapy helped but he still suffered back and shoulder pain. (R. at 683). Plaintiff had a full range of motion in his cervical spine and he denied any weakness or numbness. (*Id.*). Dr. Werries referred Plaintiff to Gerald J. Ross, M.D., who completed a radiology report on February 16, 2005. (R. at 318). Dr. Ross observed some posterior osteophytic spurring on a vertebrae but it did not encroach Plaintiff's spinal cord. (*Id.*). The remaining cervical vertebra and intervertebral discs were observed to be normal. (*Id.*).

Plaintiff's pain was unchanged when he returned to Dr. Werries on March 2, 2005. (R. at 681). He told Dr. Werries that massage therapy was ineffective and joint injections were followed by increased lower back pain. (*Id.*). His symptoms were exacerbated by lifting. (*Id.*). Ultram[3] and Celebrex[4] provided minimal relief. (*Id.*). On April 20, 2005, Plaintiff told Dr. Werries that his lower back pain had been aggravated days earlier while he was standing on a ladder. (R. at 679). His medications provided minimal relief. (*Id.*).

Plaintiff presented to Dr. Werries on August 24, 2005 complaining of pain in his lower back and left thigh. (R. at 506). He told Dr. Werries that a disc decompression procedure[5] he underwent at Allegheny General Hospital on August 18, 2005 had not relieved his symptoms and

---

[3] Ultram (generic name "Ultram") "is used to relieve moderate to moderately severe pain, including pain after surgery." Mayo Clinic, Tramadol, *available at http://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050* (last visited April 18, 2014).

[4] Celebrex (generic name "Celecoxib") "is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain and help relieve symptoms of arthritis." Mayo Clinic, Celecoxib, *available at http://www.mayoclinic.org/drugs-supplements/celecoxib-oral-route/description/drg-20068925* (last visited April 18, 2014).

[5] Dr. LoDico performed a decompression procedure at Allegheny General Hospital on August 18, 2005 for disruption with subannular disc herniation. (R. at 266-267, 306). A pain clinic note dictated by Dr. LoDico indicated that patient tolerated that procedure well. (R. at 267).

using a brace had aggravated his pain. (R. at 506, 266-267, 306). Dr. Werries recommended that Plaintiff return for follow-up after undergoing an MRI. (R. at 507). On August 31, 2005, Plaintiff complained of worsening symptoms including severe low back pain and pain in his right buttock radiating into his thigh. (R. at 594). Dr. Werries recommended surgery to treat lumbar spondylosis. (R. at 595).

On September 27, 2005, Dr. Werries performed an "L3-L4-L5 laminectomy foraminotomy with an L3 to S1 posterolateral fusion with the use of iliac cred bone graft, local autograft, allograft instrumentation along with placement of a posterior lumbar interbody fusion at L4-5 and L5-S1". (R. at 306, 457). The preoperative report indicated lumbar spondylosis as Plaintiff's preoperative and postoperative diagnosis. (R. at 308). There were no complications. (R. at 308, 312). In a report completed prior to discharge, Dr. Werries noted that Plaintiff's pain was under control and he was able to ambulate with minimal difficulty. (R. at 306). Plaintiff was discharged on September 30, 2005 with instructions to continue wearing a brace and taking pain medication. (R. at 306-307).

Plaintiff told Dr. Werries on October 12, 2005 that he was doing well since his surgery but suffered increasing pain in his thighs. (R. at 502). His back pain was minimal. (*Id.*). Both of Plaintiff's surgical scars were well healed with no signs of infection. (*Id.*). X-rays from this visit showed excellent alignment of the screws and grafts with no sign of hardware failure. (*Id.*). On October 19, 2005, X-rays indicated a possibility of Plaintiff's bone graft becoming dislodged. (*Id.*). Dr. Werries confirmed on October 26, 2005 that X-rays showed a questionable dislodgement of the bone graft and recommended removal of the hardware. (R. at 449, 498-499, 668).

Dr. Werries admitted Plaintiff to Ohio Valley General Hospital for removal of the hardware on October 28, 2005. (R. at 449). Plaintiff tolerated the surgery well and there were no complications. (R. at 449). His pain was controlled and he was discharged two days later. (*Id*.). He was prescribed Oxycontin and Percocet. (R. at 455).

Dr. Werries opined on November 9, 2005 that Plaintiff had done very well since surgery. (R. at 534). He reported reduced leg and back pain and Plaintiff no longer required OxyContin but still took Percocet and Celebrex. (*Id.*). Plaintiff characterized his condition as "very well" on December 14, 2005, reporting minimal back pain and mild pain from the surgical incision. (R. at 536). He felt that his symptoms had improved by sixty to seventy percent. (*Id.*). His ability to stand or walk for longer periods of time was improved. (*Id.*). He still used a cane to ambulate but told Dr. Werries it was "mostly for security reasons." (*Id.*).

On January 11, 2006, Dr. Werries concluded that Plaintiff could return to a modified work duty. (R. at 544). Plaintiff told Dr. Werries that his most recent back injection provided minimal relief but physical therapy was helping and he was "doing fairly well." (R. at 661). Dr. Werries advised Plaintiff to start aqua therapy and wean himself off of narcotics. (R. at 662). Plaintiff was assessed with the following limitations: must have the ability to change position as needed; may not lift more than twenty-five pounds; not able to climb ladders; occasionally able to bend, climb stairs, crawl, squat, reach, push/pull, or grasp; and occasionally able to engage in fine manipulation or repetitive motion. (*Id.*).

Plaintiff was "doing fairly well" on February 22, 2006 since his last visit and reported that physical therapy and aqua therapy were helping to strengthen his legs. (R. at 659). He reported that the pain in his anterior thigh had been resolved but he still suffered from persistent lower back pain as well as pain over his bone donor site. (*Id.*). Although he continued to suffer

from pain, he reported that his symptoms were lessened since surgery and he was pleased with the results of his treatment. (*Id.*). The vocational limitations as assessed during his most recent visit were unchanged. (R. at 540).

He again reported "doing fairly well" on May 31, 2006. (R. at 657). His pain was aggravated by walking up and down stairs but sitting provided relief. (*Id.*). He had a negative straight leg raise result. (*Id.*). On August 30, 2006, Plaintiff told Dr. Werries that the last injection he received provided no relief and his back pain and spasms had increased. (R. at 655). X-rays showed no sign of instability or hardware failure but Dr. Werries noted the possibility of posterior displacement of the graft. (*Id.*). Plaintiff had a positive straight leg raise on the left. (*Id.*). He was given a prescription for Percocet, Celebrex, and Flexeril.[6] (R. at 656). An MRI was recommended to rule out nerve root impingement. (*Id.*).

On September 6, 2006, Plaintiff reported improvement in his back pain since taking Flexeril but still suffered from intermittent pain radiating down his left buttock and into his thigh. (R. at 653). An MRI revealed no significant nerve root impingement. (*Id.*) Dr. Werries recommended that Plaintiff start epidural steroid injections[7] of the lumbar spine. (*Id.*). Plaintiff returned to Dr. Werries on November 8, 2006 after receiving three steroid injections. (R. at 652). He reported that he was "doing fairly well" and that his back pain was tolerable with medication and the injections. (R. at 652).

Plaintiff told Dr. Werries on February 7, 2007 that steroid injections provided "significant relief" for his pain for two to three weeks after each injection. (R. at 650). He continued to

---

[6] Flexeril (generic name "Cyclobenzaprine") "is used to help relax certain muscles in your body. It helps relieve the pain, stiffness, and discomfort caused by strains, sprains, or injuries to your muscles." Mayo Clinic, Cyclobenzaprine, *available at http://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236* (last visited April 4, 2014).

[7] "Epidural steroid contain drugs that mimic the effects of the hormones cortisone and hydrocortisone. When injected near irritated nerves in your spine, these drugs may temporarily reduce inflammation and help to relieve pain." Mayo Clinic, Diseases and Conditions, *available at http://www.mayoclinic.org/diseases-conditions/back-pain/expert-answers/epidural-steroid-injections/faq-20058277* (last visit April 18 , 2014).

experience pain in his left buttock, radiating down his left thigh. (*Id.*). Aqua therapy helped his symptoms along with Lyrica and Celebrex. (*Id.*). He had reduced his use of Percocet. (*Id.*).

On May 30, 2007, Plaintiff told Dr. Werries that he was "doing fairly well" and his pain usually ranked between one and two out of ten. (R. at 648). OxyContin, Lyrica, and Celebrex were effective at reducing his pain. (*Id.*). He told Dr. Werries on September 26, 2007 that he was able to live with his back pain. (R. at 995).

When he returned on November 5, 2008, Plaintiff told Dr. Werries that he had been rear-ended in another car accident two days earlier and was suffering from increased back pain which radiated down his leg into his left thigh. (R. at 993). Plaintiff was wearing a safety-belt at the time of the accident and the airbag was not deployed. (*Id.*). Dr. Werries made the following physical findings: fairly labored gait; difficulty arising from a seated position; slow cadence; and difficulty walking on his heels and toes. (*Id.*). He had a positive straight leg raise. (*Id.*). At his next visit on November 12, 2008, Plaintiff reported that his symptoms had improved. (R. at 992). His gait was fairly normal, he could rise from a seated position with less difficulty, and he was able to walk on his toes and heels without difficulty. (*Id.*). An MRI of his spine taken on November 9, 2008, two days after his second car accident, showed no change when compared with an MRI taken before the accident. (*Id.*). Dr. Werries recommended physical therapy. (*Id.*).

Plaintiff did not return to Dr. Werries until December 23, 2009, at which time he complained that spinal injections provided temporary relief but he still suffered from lower back pain. (R. at 1029). He complained of constant pain in his left calf and thigh and felt that his symptoms were worsening. (*Id.*). X-rays of Plaintiff's lumbar spine showed "excellent alignment of the pedicle screws, adequate posterolateral gutters, excellent alignment of interbody spacers, and no signs of hardware failure." (R. at 1030). Once again, Plaintiff had a negative

straight leg raise report. (*Id.*). An EMG study showed mild nerve root irritation. (*Id.*). The record does not indicate that Plaintiff received any further treatment from Dr. Werries.

### ii. Back and Neck Injections with Dr. Alka Kaushik, M.D.

Plaintiff was given a series of injections by Alka Kaushik, M.D., at North Hills Pain Management from 2004 to 2007. (R. at 258, 765). On August 25, 2004 Dr. Kaushik opined that an MRI of Plaintiff's spine, taken after his first car accident, was within normal limits. (R. at 784). Yet, Dr. Kaushik began performing joint injections of Methylprednisone[8] on September 14, 2004. (R. at 324). Plaintiff consistently tolerated this procedure well. (R. at 324-328, 581, 770-771, 785-786, 788-790). In fact, he reported complete pain relief after the first procedure. (*Id.*).

On October 27, 2004, Plaintiff's spasms and pain were decreased. (R. at 262). His lower back pain was only aggravated by standing and walking but was relieved while at rest. (*Id.*). Dr. Kaushik reviewed his MRI showing that the lumbar spine was within normal limits. (*Id.*). Plaintiff returned to Dr. Kaushik on October 29, 2004 and acknowledged significant but temporary relief. (R. at 326). On November 18, 2004, Dr. Kaushik signed a treatment note practically identical to the one completed after the previous visit. (R. at 258). On November 23, 2004, Dr. Kaushik performed a rhizotomy, which Platintiff tolerated well and prescribed Percocet. (R. at 327). (*Id.*). Plaintiff told Dr. Kaushik on January 26, 2005 that he had experienced one hundred percent relief over the past two to three weeks. (R. at 777). His pain had increased, however, when he returned on February 16, 2005. (*Id.*). Plaintiff's injection was administered by Mark LoDico, M.D., on April 3, 2006. (R. at 581). When he returned on April 24, 2006, he told Dr. LoDico that the previous injection relieved his pain for two days. (*Id.*).

---

[8] "Methylprednisolone provides relief for inflamed areas of the body." Mayo Clinic, Methylprednisolone, *available at http://www.mayoclinic.org/drugs-supplements/methylprednisolone-oral-route/description/drg-20075237* (last visited April 18, 2014).

He complained of intense pressure during the procedure on November 3, 2006 and Dr. Kaushik suggested he consider trigger point injections.[9]  (R. at 787).  Plaintiff reported a fifty to sixty percent reduction in pain when he returned on November 15, 2006.  (R. at 773).  Dr. Kaushik performed trigger point injections on December 29, 2006 which Plaintiff tolerated well. (R. at 786).  On January 17, 2007, Dr. Kaushik noted that Plaintiff's pain was "fairly well controlled."  (R. at 771).  Plaintiff returned on February 23, 2007 and Dr. Kaushik performed a nerve block which he tolerated well.  (R. at 785).  A month later, Dr. Kaushik noted that Plaintiff's pain was "well controlled" and instructed him to continue taking his medication.  (R. at 767).  His symptoms were unchanged when he saw Dr. Kaushik on May 13, 2007.  (R. at 766).  Plaintiff told Dr. Kaushik that he was active and exercised on a daily basis.  (*Id.*).  On September 6, 2007 Plaintiff again indicated that his medications worked well and he was active. (R. at 765).

### iii.  Physical Therapy

Plaintiff began receiving physical therapy at Eagle Physical Therapy on December 9, 2004.  (R. at 219).  During his initial evaluation he complained of back spasms and pain in his neck, shoulder, and back.  (*Id.*).  He was assessed with a functional level of seventy-five percent, whereas he was at one hundred percent prior to his injury.  (*Id.*).  Plaintiff ranked his pain as one to five out of ten.  (*Id.*).  Less than a month later on December 30, 2004, he still experienced discomfort but it was "not as painful."  (R. at 212).  Plaintiff's functional level improved to ninety-five percent on July 1, 2004.  (R. at 196).  He rated his pain level as one to four out of ten.

---

[9]        "Trigger points are highly sensitive areas within the muscles that are painful to the touch and cause pain that can be felt in another area of the body."  Cleveland Clinic, Diseases and Conditions, *available at http://my.clevelandclinic.org/disorders/chronic_myofascial_pain/hic_chronic_myofascial_pain_cmp.aspx* (last visited April 18, 2014).

(*Id.*).   A discharge summary dated February 2, 2005 indicated a zero out of ten on the pain scale and a functional rating of ninety-five percent.  (R. at 628).  (*Id.*).

Plaintiff began physical therapy at Keystone Rehabilitation Systems ("Keystone") on December 29, 2005.  (R. at 799).  He rated his daily pain between three and seven out of ten. (*Id.*).  Plaintiff had a twenty-five pound lifting restriction.  (*Id.*).  His straight leg test was negative.  (*Id.*).  After eighteen sessions at Keystone, Plaintiff rated his pain as four to eight out of ten depending on his level of activity.  (R. at 820).  He again had a negative straight leg raise result.  (*Id.*).  On May 26, 2006, Plaintiff told his therapist at Keystone that his symptoms had not improved since surgery.  (R. at 847).  He rated his pain as three to four out of ten on average and five to six at its worst.  (*Id.*).  On August 28, 2006, a progress report completed at Keystone indicated that Plaintiff's pain was two out of ten on average and five at its worst.  (R. at 872). Plaintiff continued physical therapy at Keystone until October 9, 2007.  (R. at 976).  Treatment notes indicated no significant changes in his complaints of pain.  (R. at 873-976).

### iv.  Pain clinic treatment with Dr. Lloyd Lamperski, M.D.

Plaintiff was seen on March 15, 2005 by Dr. Lloyd Lamperski, M.D, at the Allegheny General Hospital Pain Clinic ("Allegheny").  (R. at 270).  Plaintiff described his pain as "excruciating" and "very intense" but it was lessened by sitting, walking, lying down, medication, and relaxing.  (*Id.*).  In a note dated May 21, 2005, Dr. Lamperski observed that Plaintiff's gait was intact, he was able to stand on his heels and toes, his lower extremity strength was normal, his knee and ankle jerks were normal, and his straight leg raise was negative bilaterally.  (*Id.*).  He had no new symptoms.  (*Id.*).  Dr. Lamperski's objective findings were unchanged on June 21, 2005.  (*Id.*).

On March 29, 2006, Plaintiff reported left low back pain, incisional pain, right buttock pain radiating down his right thigh to his calf, and right lower back pain to a lesser extent. (R. at 582-583). His left lower back pain was unimproved and his right lower extremity pain was worse. (*Id.*). Dr. Laperski observed that Plaintiff was able to slowly rise from a seated position and ambulate. (*Id.*). He could stand on his heels and toes. (*Id.*). Strength in his lower extremities was normal. (*Id.*).

Plaintiff returned to Dr. Laperski on April 19, 2006 complaining of pain in his lower back and extremities which he rated as a four out of ten. (R. at 579-580). He reported that the surgery performed by Dr. Werries had allowed him to stand for longer amounts of time but also increased the pain in his lower extremities. (*Id.*). He told Dr. Laperski that he took one to two Percocets per day but tried to take as few as possible. (*Id.*).

On June 2, 2006, Plaintiff told Dr. Lamperski that the steroid injections had not relieved his back and leg pain. (R. at 576). He complained of pain radiating down his posterior thighs and occasionally down the posterior aspect of his legs. (*Id.*). Plaintiff was informed of the possibility of having an intrathecal morphine pump[10] surgically implanted but he did not want to pursue that treatment option. (*Id.*). He was taking Percocet and Celebrex. (*Id.*). Dr. Lampreski observed that Plaintiff was able to arise from a seated position without difficulty and exhibited no obvious pain. (*Id.*). Plaintiff's lower extremity strength was intact and he was able to stand on his heels and toes. (*Id.*).

### v. Magnetic Resonance Imaging

---

[10] "Intrathecal pain pump insertion is a procedure to help with pain management. A small pump will be inserted in your body. The pump will be able to deliver pain medication to the area around your spinal cord. This pain management technique is often only used if noninvasive pain management has failed or has negative side effects." Mount Sinai Hospital, Intrathecal Pain Pump Insertion, *available at http://www.mountsinai.org/patient-care/health-library/treatments-and-procedures/intrathecal-pain-pump-insertion* (last visited April 7, 2014).

Plaintiff underwent an MRI of his lumbar spine on August 26, 2005 at the University of Pittsburgh Medical Center Passavant Hospital ("UPMC"). (R. at 1033). Peter J. Fedyshin, M.D, completed a report which indicated intact marrow spaces, no evidence of fractures or metastatic disease, and mild to moderate disc degeneration throughout his lumbar spine. (R. at 331). An MRI report from UPMC dated October 24, 2005 indicated mild degenerative disc disease and "extensive postoperative changes." (R. at 320). Similar findings appear in a report dated August 31, 2006. (R. at 1031). A report from September 20, 2007 showed no further root nerve impingement. (R. at 995). A final report dated November 7, 2008 indicated that little had changed since the past examination. (R. at 1002-1004).

### vi. Andrew D. DeMarco, M.D. and David Figucia, M.D.

Andrew D. DeMarco, M.D., and David Figucia, M.D., treated Plaintiff at Pine-Richland Medical Associates between 2002 and 2012. (R. at 188, 300, 1075). On March 2, 2004, Dr. DeMarco, Plaintiff's primary care physician, diagnosed Plaintiff with whiplash following his car accident and prescribed Vicodin, Motrin, and muscle relaxers. (R. at 300, 302, 303). On March 10, 2004, Plaintiff was seen by Dr. Figucia who prescribed Valium and advised him to remain off of work. (R. at 188). He returned on March 29, 2004 and told Dr. Figucia that his neck and upper back had been improving slowly. (R. at 186). There were no radicular symptoms in his buttocks or legs. (*Id.*). Dr. Figucia instructed Plaintiff not to work and extended his physical therapy prescription to include treatment for lumbar strain and spasms. (*Id.*). On April 12, 2004, Plaintiff continued to experience lumbar pain "with most activities." (R. at 184). Dr. Figucia prescribed Prednisone and told Plaintiff to stay off of work. (*Id.*). Dr. Figucia's treatment note dated December 8, 2004 included the following objective findings: normal gait; ability to walk

on his toes and heels without difficulty; a full range of motion of the cervical spine; and slight pain on palpation over the right trapezial muscle. (R. at 220-221).

Plaintiff was seen by Dr. DeMarco on September 13, 2005 prior to undergoing his initial surgery. (R. at 298). Plaintiff denied weakness, numbness, or tingling in any extremity. (*Id.*). Dr. DeMarco concluded that Plaintiff did not present any health conditions which would provide cause to delay his surgery. (R. at 299).

On September 11, 2007, Dr. DeMarco completed a medical source statement of Plaintiff's ability to perform work-related physical activities. (R. at 743-751). This form consisted of several check mark boxes and spaces for supportive medical findings. (*Id.*). Plaintiff's limitations were assessed as follows: occasionally able to lift and/or carry two to three pounds;[11] never able to lift and/or carry ten or more pounds; able to stand and walk less than thirty minutes per day; able to sit for ten to fifteen minutes at a time; and unable to push or pull. (R. at 743-744). As to postural limitations, Dr. DeMarco opined that Plaintiff was not able to bend, kneel, stoop, crouch, balance, or climb. (R. at 745). On the same day Dr. DeMarco completed a "workers' injury report" listing Plaintiff's diagnosis as "failed back syndrome." (R. at 751). Dr. DeMarco opined that Plaintiff's prognosis for long-term recovery was poor and he could not return to his previous employment without the aforementioned restrictions. (*Id.*).

Plaintiff returned to Dr. DeMarco on August 4, 2009 complaining of right testicular pain. (R. at 1035). Objective findings from that visit were unremarkable. (*Id.*). (Dr. DeMarco believed it was related to his low back condition but found Plaintiff to be functional and did not recommend any treatment. (*Id.*).)

Dr. DeMarco completed another assessment of Plaintiff's ability to perform work-related physical activities on November 30, 2010. (R. at 1023-1028). Plaintiff was diagnosed with

---

[11]     The report defines "occasionally" as "from very little up to 1/3 of an 8 hour day." (R. at 1027).

failed back syndrome and chronic pain syndrome.  (R. at 1023).  His lower back pain was severe and radiated down his left leg.  (*Id.*).  Lying down alone gave Plaintiff relief but sitting, standing, or walking aggravated his pain.  (*Id.*).  Dr. DeMarco noted a reduced range of motion in Plaintiff's lumbar spine, atrophy in his left calf, decreased sensation in his left leg, absent reflexes, and positive straight leg raising tests in his left leg in the supine position.  (R. at 1023-1025).  Plaintiff required a cane for ambulation and weight bearing.  (R. at 1025).  Dr. DeMarco assessed Plaintiff with the following limitations: occasionally able to lift or carry no more than two to three pounds; able to stand and walk one hour or less during an eight hour day; able to sit one to two hours in an eight hour day; and never able to bend, kneel, stoop, crouch, balance, or climb.  (R. at 1027-1028).  The record does not indicate that Plaintiff sought any further treatment from Dr. DeMarco or his other physicians in 2010 or 2011.

Plaintiff returned to Dr. DeMarco on February 1, 2012 and was diagnosed with a deep vein thrombosis.[12]  (R. at 1085-1086).  Plaintiff complained of calf and chest pain.  (*Id.*).  On February 6, 2012 Plaintiff tested positive for a genetic disorder which causes increased blood clotting.  (R. at 1073).  He was told to stop taking Celebrex due to complications with the disorder.  (*Id.*).  Plaintiff denied weakness, numbness or tingling in any extremity.  (*Id.*).  He was prescribed blood clot medication.  (*Id.*).  Plaintiff returned on March 26, 2012 and told Dr. DeMarco that he had been outside working and very active on his feet.  (R. at 1151).  Soon thereafter he awoke in pain and swelling in his leg.  (*Id.*).  He again denied any weakness, numbness, or tingling in his extremities.  (*Id.*).

### vii.  James L. Cosgrove, M.D.

---

[12]     "Deep vein thrombosis (DVT) is a condition in which a blood clot (thrombus) forms in one or more of the deep veins in your body, usually in your legs."  Mayo Clinic, Deep vein thrombosis, *available at http://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/basics/definition/con-20031922* (last visited April 18, 2014).

Plaintiff was seen by James L. Cosgrove, M.D., at Tri-River Surgical Associates on January 13, 2012. (R. at 1120). Dr. Cosgrove noted that Plaintiff was maintained on a chronic narcotic regimen of Oxycontin. (*Id.*). He complained of back and leg pain and told Dr. Cosgrove that he sometimes took three Oxycontin in one day. (*Id.*). Dr. Cosgrove advised Plaintiff that taking this dosage was a violation of his narcotic contract. (*Id.*). Objective findings from that examination indicate that Plaintiff: had a well healed surgical scar; was in no acute distress; walked with a slight limp; and had a limited range of motion. (*Id.*). Dr. Cosgrove refilled his prescriptions and prescribed Oxycontin IR[13] to be taken "on those rare days when he needs breakthrough pain relief." (*Id.*).

Plaintiff returned to Dr. Cosgrove on February 1, 2012 complaining of pain in his knee, thigh, and back. (R. at 1121). Dr. Cosgrove's note indicates that Plaintiff was "in a mild amount of discomfort." (*Id.*). Plaintiff told Dr. Cosgrove that he had a family history of blood clots. (*Id.*). On March 9, 2012, Plaintiff was doing reasonably well despite some increased back pain. (R. at 1122). Dr. Cosgrove noted that this pain may be related to Plaintiff's discontinued use of Celebrex. (*Id.*). His pain was maintained with Oxycontin, Cymbalta, and a Lipoderm patch. (*Id.*). Plaintiff walked with a limp, was in no acute distress, and was able to functionally ambulate. (*Id.*).

### i. Consultative Evaluation by Paul Fox, M.D.

On December 7, 2010, Paul Fox, M.D., completed a consultative evaluation of Plaintiff's medical records. (R. at 65-67). Dr. Fox assessed Plaintiff with the following exertional limitations: occasionally able to lift and/or carry twenty pounds; frequently able to lift and/or carry ten pounds; able to stand and/or walk for two hours; and able to sit for a total of six hours

---

[13] Oxycontin IR is used to treat pain that "you only have once in a while." Mayo Clinic, Oxycodone, *available at http://www.mayoclinic.org/drugs-supplements/oxycodone-oral-route/description/drg-20074193* (last visited April 18, 2014).

in an eight hour workday. (R. at 66.). He explained that Plaintiff's need to alternate between sitting and standing could be accommodated by normal break periods throughout the workday. (*Id.*). Plaintiff's postural limitations were assessed as follows: occasionally able to climb ramps/stairs; occasionally able to climb ladders/ropes/scaffolds; occasionally able to balance; occasionally able to bend at the waist; never able to kneel; occasionally able to bend at the knee; and never able to crawl. (*Id.*). Dr. Fox found Plaintiff's statements concerning the severity of his pain partially credible based upon the evidence of record. (R. at 67). He noted that his assessment partially reflected the limitations observed in Dr. DeMarco's reports. (*Id.*).

### D. Administrative Hearing

A hearing was held before the ALJ, Joanna Papazekos, on April 20, 2012 in Pittsburgh, Pennsylvania. (R. at 35). Plaintiff was present and was represented by counsel, Ronald T. Elliot, Esq. (*Id.*). A vocational expert, Dr. Charles M Cohen, Ph. D.,[14] was also present and offered testimony. (*Id.*). Plaintiff was born on November 11, 1967 and was forty-four years old[15] at the time of the hearing. (R. at 37). He weighed approximately two hundred and fifty-five pounds and was six feet and six inches tall. (*Id.*). Plaintiff's wife was employed and he was covered under her insurance plan. (*Id.*). Her wages were his sole source of income. (*Id.*). He had a driver's license and occasionally drove but testified that he was unable to take long car trips because of blood clots and his sciatic nerve problems. (R. at 38). Plaintiff did not complete high school or earn a Graduate Equivalence Diploma ("GED") but had no difficulty reading or writing. (*Id.*).

---

[14]     Charles M. Cohen holds B.A. in psychology, an M. Ed. in rehabilitative counseling, and a Ph. D. in counselor education. (R. at `117). Since 1970, Dr. Cohen has been engaged in the private practice of rehabilitative psychology, including psychological, vocational, and economic evaluation and psychotherapy. (*Id.*).

[15]     The SSA's regulations define "Younger Person" as a person who is less than 50 years of age. 20 C.F.R. §§ 404.1563, 416.963.

From 1990 to 2005, Plaintiff worked for an insurance restoration company repairing homes that were damaged by fire or natural disasters. (R. at 40). He became a manager for that company in 1999. (R.at 41). Although Plaintiff testified that he had not worked since his alleged onset date of September 1, 2005, the ALJ noted that Plaintiff earned over $9,000 in 2008. (R. at 39). Plaintiff explained that he had worked part time as a secretary for part of that year but was let go because he was not qualified for the position. (R. at 39-40).

Plaintiff alleged that he was disabled due to low back and sciatic nerve pain. (R. at 41). He had two surgeries to treat these conditions in 2005. (R. at 42). His doctors told him that there were no long term cures or additional surgeries but suggested the possibility of installing a morphine pump in his stomach. (R. at 43). Plaintiff decided not to undergo that treatment. (*Id.*). He saw Dr. Cosgrove for refills of his medications and injections on a monthly basis. (R. at 43-44). Dr. Werries treated Plaintiff once or twice per year. (R. at 44). He explained that he was able to carry items that were not very heavy but was limited in his ability to bend over and pick the items up. (*Id.*). Plaintiff alleged that he was unable to lift a frying pan or take things out of the oven. (R. at 45).

The only time that Plaintiff's pain was relieved was when he sat in a reclining chair. (R. at 45). His medications provided some relief but lowered his libido and sometimes caused nausea. (R. at 45-46). He used an electronic stimulation machine, a lidocaine patch, and a back brace. (R. at 46). Plaintiff used a cane when walking on unstable ground or snow. (*Id.*). The ALJ posited whether Plaintiff would use his cane if walking through Walmart and Plaintiff said no. (*Id.*). He installed a raised toilet and shower chair in his bathroom and had two reclining chairs. (*Id.*). Plaintiff stated that he was unable to sit on hard surfaces. (R. at 47). The ALJ noted that the chair Plaintiff was sitting in during the hearing was hard and that he had been

sitting on one side of it while supporting himself with his hand. (R. at 47). Plaintiff asserted that he could not sit in the chair for more than ten to fifteen minutes without standing up, moving, or "fidgeting." (R. at 48). He stated that he could stand in a stationary position for a "few minutes" but would have to sit immediately if his right side began to hurt. (*Id.*). Plaintiff was able to walk for approximately 15 minutes but walking long distances caused fatigue. (R. at 48-49). The acts of bending and lifting sent Plaintiff's "pain through the ceiling." (R. at 49). He was unable to lift his hands above his head without pain but was able to work with his hands as long as he was sitting in a comfortable position. (*Id.*).

Plaintiff explained that he was short tempered when interacting with other people which he attributed to his medications. (*Id.*). He was not always able to finish the tasks that he started. (R. at 50). Pain affected his ability to concentrate but he was not receiving any mental health treatment. (*Id.*). Plaintiff could only sleep in a particular position or he would suffer pain. (*Id.*). Although he thought he would be able to ride a bus, he was not certain he would be able to wait for the bus or climb on and off of it. (R. at 51). On some days, Plaintiff required help putting on socks but never required help bathing. (*Id.*). A "good day" was characterized as a pain level of three or four and a "bad day" meant a pain level of seven. (*Id.*). When Plaintiff was having a "bad day," he tried to stay in his recliner all day. (*Id.*). Plaintiff was upright and moving around to some extent on "good days." (*Id.*). He could sit at the table and cut vegetables for his wife or fold laundry while sitting in his recliner. (R. at 51-52). There was an even split between Plaintiff's number of good and bad days. (R. at 52). Being active on his "good days" usually resulted in him being sore the following day. (*Id.*).

He was able to put food in the microwave and open a can but could not stand in front of a stove. (R. at 52-53). Plaintiff did not bend over to put anything in or pull anything out of the

oven or the dishwasher.  (R. at 53).  He could unload the top shelf of the dishwasher.  (*Id.*).  His activities outside the home were limited but he was able to sit on his riding lawn mower for fifteen to twenty minutes at a time.  (*Id.*).  Plaintiff could not go to the movies because of discomfort and no longer attended races or hockey games.  (*Id.*).  He did not have any hobbies.  (R. at 54).

The vocational expert, Dr. Cohen, proceeded to give testimony regarding Plaintiff's work history.  (*Id.*).  Plaintiff had past work painting and hanging dry wall as the manager of a restoration crew (heavy, skilled work).  (R. at 55).  The ALJ posited the following hypothetical:

> I need you to assume someone of the Claimant's age, education, and past work experience who is limited to light work as that is defined, and who requires a sit stand option such that they would alternate in positions every 30 minutes, occasionally postural maneuvers, but no bending, climbing, crouching, and crawling, no hazards, no extremes in temperature, and no walking on uneven terrain.  I need the work to be simple, routine, repetitive, no work which is production rate pace work, rate work pace work, no work where someone has to keep up with a machine.  Stopping there for a moment, would such a person be able to return to past work?

(R. at 56).  Dr. Cohen determined that such an individual would not be able to perform Plaintiff's past work.  (*Id.*).  The individual, however, would be able to perform the following positions: light cashier with a sit/stand option (250,000 positions existing nationally); light information clerk (50,000 positions existing nationally); and light inspector with a sit/stand option (60,000 positions existing nationally).  (*Id.*).

The ALJ posited an additional hypothetical as follows:

> I want you to assume someone of the Claimant's age, education, and past work experience who is limited to sedentary work as that is defined.  And who, again, requires a sit, stand, walk option where they alternate positions every 30 minutes.  A person who cannot use foot controls or push and pull with the lower extremity, no reaching overhead, a person who should not be asked to climb, including ramps, stairs, ladders, ropes, and scaffold, no balancing, occasional stooping, no kneeling, crouching, or crawling.  No work with the public, simple routine, repetitive work, no hazards or vibration, and no extremes in temperature.

(R. at 56-57). Dr. Cohen concluded that such an individual would not be able to return to Plaintiff's past work but identified the following suitable positions: sedentary night time guard (50,000 positions existing nationally); sedentary inspector job with a sit/stand option (50,000 positions existing nationally); sedentary sorter (50,000 positions existing nationally). (R. at 57).

The vocational expert explained that employers in the aforementioned industries typically tolerated only one sick day per month. (*Id.*). Rest periods in excess of fifteen minutes in the morning and afternoon and a half hour to an hour lunch period were not usually permitted. (*Id.*). Dr. Cohen added that requiring more frequent time off for doctors' appointments, illness, or breaks during the day would affect a person's ability to maintain employment. (R. at 58). He explained that employees are expected to be on task the entire day except for authorized rest periods. (*Id.*). Finally, the ALJ inquired whether a person who had to spend the majority of the day seated in a position similar to that of a reclining chair with an elevated leg rest would be able to perform light or sedentary work. (*Id.*). Dr. Cohen responded in the negative. (*Id.*).

## IV.    STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a

combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[16], 1383(c)(3)[17]; *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then

---

[16]   Section 405(g) provides in pertinent part:
   Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[17]   Section 1383(c)(3) provides in pertinent part:

   The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Hagans,* 694 F.3d at 292.

Substantial evidence is "more than a mere scintilla but may be less than a preponderance." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003). It means "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Davis v. Astrue*, 830 F. Supp.2d 31, 34 (W.D. Pa. 2011). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Mussi v. Astrue*, 744 F. Supp. 2d 390, 404–05 (W.D. Pa. 2010) (quoting *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998)); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196–97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. Ctr. v. Sebelius*, 566 F.3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Ctr. v. Heckler*, 806 F. 2d 1185, 1190–91 (3d. Cir. 1986)).

## V.   DISCUSSION

### A. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirements of the Act on December 31, 2011. (R. at 17). He did not engage in substantial gainful activity during the period from his alleged onset date of September 1, 2005 through the last insured date of December 31, 2011. (*Id.*). Although Plaintiff acknowledged working three to four hours per day, three to four days per week during 2008, the ALJ concluded that his earnings were not significant enough to equal substantial gainful activity. (*Id.*). The ALJ noted that this employment was not viewed as conclusive evidence on the issue of Plaintiff's alleged disability but did consider it *de facto* evidence of capacity for certain tasks. (*Id.*).

Plaintiff was found to have the following severe impairments: degenerative disc disease and radiculopathy. (R. at 17). None of his impairments, nor a combination thereof, met or medically equaled the severity of impairments listed in 20 C.F.R. § Part 404, Subpart P, Appendix 1. (*Id.*). The ALJ noted that none of Plaintiff's treating physicians described physical symptoms which, along with subjective complaints, would satisfy any of the musculoskeletal symptoms contained in the listed impairments. (R. at 18).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

[T]hrough the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), however, he is limited to alternating between sitting and both standing and walking every 30 minutes; no foot controls; no reaching overhead; no climbing, balancing, kneeling, crouching and crawling; occasional stooping; no hazards and vibrations and no exposure to temperature extremes. Further, he is limited to simple, routine repetitive work.

(*Id.*).

Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were found not credible to the extent that they were inconsistent with the ALJ's RFC. (R. at 19). The ALJ concluded that clinical findings did not support the limitations alleged by

Plaintiff during the hearing. (R. at 19). His symptoms were found to be controlled with treatment. (*Id.*). It was noted by the ALJ that there had been no frequent hospitalizations, emergency room visits or outpatient treatment for Plaintiff's alleged symptoms. (*Id.*). A discussion of Plaintiff's alleged symptoms and the relevant medical evidence followed. (R. at 18-23).

The ALJ found the severity of the limitations assessed by Dr. DeMarco inconsistent with medical evidence showing that Plaintiff functioned within normal limits when compliant with treatment. (R. at 22). It was noted that an MRI of Plaintiff's lumber spine dated November 2008 showed no large disc protrusions or severe central stenosis. (*Id.*). Further, the ALJ noted that Dr. Werries' notes from December 2009 indicated that Plaintiff had a normal gait and was able to walk on his toes and heels with normal strength. (*Id.*). After Plaintiff's second surgery, his X-rays showed excellent alignment and no signs of failure. (*Id.*). The ALJ proceeded to explain that he had resolved any doubt in favor of Plaintiff by limiting his RFC to reflect certain aspects of his alleged limitations. (*Id.*).

It was noted that Plaintiff could "prepare small meals, fold laundry, mow the lawn on a riding mower for 20 minutes, unload the top shelf of a dishwasher, go outside, drive a car, shop by computer, grocery shop, pay bills, handle a savings account, spend time with others, watch television, and independently care for his personal needs." (R. at 23). This level of activity was found inconsistent with Plaintiff's alleged limitations. (*Id.*). The ALJ accorded great weight to the opinion of the state medical consultant, Paul Fox, M.D., finding it consistent with the record as a whole. (*Id.*). The ALJ noted, however, that he credited all of Plaintiff's symptoms which were supported by the medical record and assessed Plaintiff with an RFC that was more restrictive than that assessed by Dr. Fox. (*Id.*).

Plaintiff was found unable to perform his past relevant work as a restoration crew manager (heavy, skilled). (R. at 23). He was classified as a younger individual under the regulations. (*Id.*). He had a limited education and was able to communicate in English. (*Id.*). The transferability of job skills was found immaterial to the decision on the ground that the Medical-Vocational Rules supported a finding that Plaintiff was not disabled, regardless of whether Plaintiff had transferable job skills. (*Id.*). The ALJ determined that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles. (R. at 24). Accordingly, the ALJ accepted the vocational expert's testimony that Plaintiff would be able to perform the following occupations: security guard, surveillance monitor; inspector; and sorter. (*Id.*). Finally, the ALJ concluded that Plaintiff was not under a disability, as defined under the ACT, at any time from the alleged onset date of September 1, 2005 through December 31, 2011, the date Plaintiff was last insured. (R. at 25).

### B. Plaintiff's Objections to the ALJ's Decision

Plaintiff argues the following on appeal before this Court: (1) the ALJ improperly disregarded Dr. DeMarco's medical opinion; (2) the ALJ erred in assessing Plaintiff's credibility and his RFC; (3) the ALJ wrongly determined that Plaintiff did not meet the impairments listed in 20 C.F.R. § Part 404, Subpart P, Appendix 1; (4) and the ALJ ignored the testimony of the vocational expert and relied on a hypothetical that was allegedly incomplete. (Docket No. 13). Defendant responds that the ALJ's decision was supported by substantial evidence. (Docket No. 17).

### C. Dr. DeMarco's Opinion

Plaintiff first argues that the ALJ erred by according little weight to the opinions of his primary care physician, Dr. DeMarco, who opined that he suffered from severe limitations

rendering him disabled. (Docket No. 13 at 10). Defendant counters that the ALJ appropriately weighed and discredited the evidence from this medical source. (Docket No. 17). The Court agrees with Defendant that the ALJ's decision granting little weight to Dr. DeMarco's opinions was supported by substantial evidence.

The medical opinions of treating physicians are generally entitled to substantial and possibly controlling weight. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201–02 (3d Cir. 2008); *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); S.S.R. 96-5P, 1996 WL 374183, at *4. However, in order to be given greater weight, the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). The ALJ is entitled to weigh all of the evidence in the record and may assign a non-treating physician's opinion greater weight if that decision is supported by the record evidence. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). In weighing relevant medical evidence, the ALJ may choose which opinions to accord greater weight, but may not reject or ignore evidence in the record without providing a rationale. *Id.* (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)). The opinion of a treating physician may be rejected outright only on the ground of contradictory medical evidence. *Id.*

Contrary to Plaintiff's arguments, the ALJ did not substitute her own judgment for that of Plaintiff's physician, Dr. DeMarco. In a thorough and well-reasoned decision, the ALJ discussed all of the relevant treatment evidence and properly concluded that the severe limitations assessed by Dr. DeMarco were inconsistent with the record as a whole. (R. at 20, 743-751, 1023-1028). Although it is clear from the record that Plaintiff suffers from back pain, it is equally clear that his symptoms have generally improved with treatment. (R. at 22, 1120-1122). Plaintiff's

discharge summary from physical therapy on February 9, 2005 indicated substantial improvement with a ninety-five percent functional score and a pain level of zero. (R. at 22, 631). Treatment notes written in 2007 by Dr. Kaushik, Plaintiff's pain management physician, indicated that medication controlled his pain well. (R. at 22, 765-767). Further, Plaintiff told Dr. Kaushik that he was active, exercising, and planning to start his own business. (R. at 22, 765-766).

Treatment notes by Dr. Cosgrove from 2012 indicated that Plaintiff's symptoms were maintained with a regimen of narcotics. (R. at 22, 1120). Dr. Cosgrove noted only mild discomfort on February 1, 2012. (R. at 1121). Although Plaintiff complained of increased back pain on March 9, 2012, Dr. Cosgrove believed it could be associated with Plaintiff discontinuing Celebrex. (R. at 1122). Plaintiff only needed "breakthrough pain relief" on rare occasions. (R. 1120-1122). These portions of the medical evidence are not compatible with the severe limitations assessed by Dr. DeMarco. (R. at 18-22, 743-751).

The fact that Plaintiff worked as a secretary for three to four hours per day during 2008 is particularly inconsistent with Dr. DeMarco's assessment. (R. at 20, 39, 743-751, 1023-1028). It is nearly impossible to reconcile Dr. DeMarco's opinion that Plaintiff cannot walk for more than one hour and cannot sit for more than one to two hours per day with such work history. (R. at 20, 39, 1023-1028). Moreover, Plaintiff did not quit this job because of pain; rather, he left because he felt incompetent. (R. at 39). Dr. DeMarco's observation that Plaintiff required a cane for ambulation and weight bearing is also inconsistent with the record. (R. at 1025). Plaintiff testified that he used a cane when walking on unstable ground or snow but would not need one to walk while shopping. (R. at 20, 46). He similarly told Dr. Werries that he only used the cane for "security." (R. at 536). "Inconsistencies in a claimant's testimony or daily activities

permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible." *Garret v. Comm'r of Soc. Sec.*, 274 F.App'x. 159, 164 (3d Cir. 2008). The ALJ was thus entitled to weigh all of the record evidence and grant less weight to Dr. DeMarco's opinion due to its inconsistency with the record as a whole. *Brown*, 649 F.3d at 196.

In addition to the above inconsistencies, the Court notes that Dr. DeMarco was Plaintiff's primary care physician and not a specialist with regard to Plaintiff's impairments. The relevant regulations provide that the ALJ will "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." §§ 404.1527(c)(5); 416.927(c)(5). The severe limitations assessed by Dr. DeMarco were not consistent with treatment notes completed by Dr. Werries, an orthopedic specialist, which showed that Plaintiff's symptoms improved with treatment. (R. at 20-22, 457). Therefore, the ALJ properly granted less weight to Dr. DeMarco's opinion. *See Hauserman v. Colvin*, Civ. A. No. 13-50, 2013 WL 2557577, *6 (W.D. Pa. June 10, 2013) (citing §§ 404.1527(c)(5) and 416.927(c)(5) and affirming the ALJ's grant of less weight to a non-specialist's opinion which was inconsistent with notes by a specialist).

Finally, Plaintiff is incorrect in stating that the ALJ completely disregarded Dr. DeMarco's opinion. (R. at 23). The ALJ incorporated the limitations assessed therein to the extent that they were consistent with the remainder of the evidence in the record. (R. at 18). Although the ALJ accorded great weight to the consultative report by Dr. Fox, who explained that Plaintiff's RFC partially reflected Dr. DeMarco's opinion, (R. at 23, 64-67), Dr. Fox's RFC was not as restrictive as Dr. DeMarco's. (R. at 23, 64-65). The ALJ further explained that she took this factor into account and formulated an RFC which was more restrictive than Dr. Fox's.

(R. at 18, 23, 64-67). For the aforementioned reasons, the ALJ's decision to grant Dr. DeMarco's opinion lesser weight was supported by substantial evidence.

### D. The ALJ's RFC and Credibility Findings

Plaintiff next brings a related challenge that the ALJ's RFC is not supported by substantial evidence because it did not reflect the severe limitations assessed by Dr. DeMarco. (Docket No. 13 at 16). Additionally, Plaintiff argues that the ALJ erred in assessing his credibility. (*Id.* at 21). RFC is defined as "the most you can still do despite your limitations. [The ALJ] will assess [a claimant's] residual functional capacity based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1). Relevant evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247 F.3d at 43. The opinion of a treating physician does not invariably determine the ALJ's RFC assessment. *Brown*, 649 F.3d at 196, n. 2. Although the ALJ must consider all of the relevant medical evidence when formulating the claimant's RFC, she need only include limitations which are credibly established. *Garret v. Comm'r of Soc. Sec.*, 274 F. App'x. 159, 163 (3d Cir. 2008). Credibility determinations are within the province of the ALJ. *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). "When making credibility findings, the ALJ must indicate which evidence [she] rejects and which [she] relies upon as the basis for [her] finding." *Salles v. Comm'r of Soc. Sec.*, 229 F.App'x 140, 146 (3d Cir. 2007). Inconsistencies between Plaintiff's testimony and daily activities may support a conclusion that a claimant is less than fully credible. *Id.*

In this Court's estimation, the ALJ completed a thorough review of the relevant evidence and properly found Plaintiff not credible to the extent that his statements concerning the limiting

effects of his impairments and pain were inconsistent with her RFC assessment. (R. at 21-22). The "ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). (Docket No 13 at 21). The ALJ may find subjective complaints of pain less than fully credible, however, if they are outweighed by conflicting evidence in the record. *Harkins v. Comm'r of Soc. Sec.*, 399 F. App'x 731, 735 (3d Cir. 2010).

Despite Plaintiff's assertion that he has been completely disabled from work since April 30, 2005, he was able to work in an office for two to three hours a day in 2008. (R. at 22, 39). Further, the record illustrates that Plaintiff's pain was managed by medication and physical therapy. (R. at 22, 196). Although Plaintiff was involved in a second car accident on November 5, 2008, an MRI report dated two days later on November 7, 2008 did not indicate any changes in Plaintiff's conditions. (R. at 993, 1002-1004). Plaintiff told Dr. Kaushik that he was active, exercising, and wanted to start a business in 2007. (R. at 22, 765-766). Further, treatment notes completed by Dr. Cosgrove in 2012 described his pain as "maintained" and he only needed "breakthrough pain relief" on rare occasions. (R. at 22, 1120). These portions of the record are not consistent with Plaintiff's testimony that he is constantly debilitated by pain and can only find relief while sitting in a reclining chair. (R. at 21, 45, 48-50, 1120-1122). The ALJ's finding that Plaintiff was less than fully credible was supported by substantial evidence. Accordingly the ALJ properly omitted the alleged limitations which were not credibly established from her RFC assessment. *See Harkins,* 399 F. App'x at 735; *Garret,* 274 F. App'x. at 163.

### E. The ALJ's Finding that Plaintiff Did Not Meet Listing 1.04A

Plaintiff further contends that the ALJ did not provide sufficient reasons to support her decision at step 3 and erred by concluding that Plaintiff did not meet Listing 1.04A. 20 C.F.R.,

Pt. 404, Subpt. P, App'x. (Docket No. 13 at 18). Defendant responds that the ALJ's decision is supported by substantial evidence. (Docket No. 17 at 11). The Court rejects Plaintiff's argument that the ALJ did not provide sufficient reasons to support her decision at step 3.

The Court initially addresses the claim that the ALJ did not sufficiently explicate her conclusion that Listing 1.04A was not met in this case. In *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000), the Third Circuit instructed that an ALJ must "set forth the reasons for [her] decision," holding that an ALJ's conclusory statement that a claimant did not have an impairment or combination of impairments that equals a listed impairment was insufficient to permit meaningful judicial review warranting a remand. *Id.* A few years later, the Third Circuit clarified this rule in *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004), explaining that an ALJ is not required to "use particular language or adhere to a particular format in conducting [her] analysis." The requirement that the ALJ must set forth the reasons for her decision at step 3 is meant to ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Id.* So long as the ALJ's decision, read as a whole, demonstrates that the ALJ considered the appropriate factors in reaching a conclusion at step 3, a remand is not appropriate. *Id.*

As discussed above, the ALJ provided a thorough analysis of all of the relevant medical evidence. (R. at 18-23). In this regard, the ALJ summarized the extensive treatment notes of Dr. Werries from 2004 to 2009. (R. at 20). She then explained that Dr. DeMarco's conclusions were not consistent with observations made by other physicians. (R. at 20-22, 518, 520, 523, 527, 534, 536, 540, 544, 547, 563, 653, 655, 665). The ALJ properly noted that the level of functioning suggested by Plaintiff's part time employment in 2008 detracted from his allegations of debilitating pain and was "de facto evidence of capacity for specific tasks." (*Id.*). As a whole,

the ALJ's decision indicates that she considered all of the relevant evidence at step 3 and provides adequate analysis for this Court to conduct a meaningful review. *See Jones*, 364 F.3d at 505.

Plaintiff's more specific argument that the ALJ erred by finding that he did not meet Listing 1.04A is also unavailing. At step 3, the ALJ must determine whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1. The burden is on the claimant to come forward with medical findings which show that the criteria of a listing are met. *Burnett*, 220 F.3d at 120 n. 2. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

Plaintiff advocates for a remand for further consideration of Listing 1.04A, which the ALJ summarily concluded was not met. (Docket No. 13). Listing 1.04A provides:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R., Pt. 404, Subpt. P, App'x 1. Courts analyzing Listing 1.04A have concluded that a claimant must point to evidence which establishes all of its criteria to demonstrate legal error warranting a remand. In *Johnson v. Comm'r of Soc. Sec.*, 263 F. App'x 199, 202-203 (3d Cir. 2008), the Third Circuit noted that although the record showed that the claimant exhibited some

of the medical criteria set forth in Listing 1.04A, there was no evidence of motor loss.  *Id*.

Accordingly, the ALJ's finding that the listing was not met was supported by substantial

evidence.  *Id*.  Likewise, in *Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x. 159, 163 (3d Cir.

2008), the Third Circuit held that the ALJ's finding that claimant did not meet Listing 1.04A was

supported by substantial evidence because the claimant failed to point to evidence of nerve root

compression.  *Id*.

Similar to the claimants in *Johnson* and *Garrett*, Plaintiff in the instant case has exhibited

*some* of the criteria in Listing 1.04A but he has not directed this Court to evidence in the record

which establishes that *all* of the necessary criteria under the listing have been met such that the

ALJ erred in her analysis.  To this end, the record reveals that Plaintiff has been diagnosed with

nerve root impingement and irritation, which the ALJ acknowledged.  (R. at 656 653, 1030).

The ALJ also discussed at length and properly discredited much of the evidence concerning the

severity of Plaintiff's symptoms and pain, all of which have been addressed by this Court above.

At most, the record evidence shows that Dr. DeMarco's objective findings from

November 30, 2010 indicate that Plaintiff meets *some* of the criteria contained in Listing 1.04A

such as absent reflexes, decreased sensation in his extremities, reduced range of motion, and a

positive straight leg raising test in the supine position.  (R. at 1023-1024).  Parallel findings do

not, however, appear consistently throughout the record.  Most recently, on February 6, 2012,

Dr. DeMarco noted that Plaintiff denied weakness, numbness or tingling in any extremity.  (R. at

1073).  Further, Dr. DeMarco only performed the straight leg raise test in the supine position and

not in the seated position, both of which are required under the listing.  (R. at 1023-1024).

Finally, physical exam notes completed between 2004 and 2012 overwhelmingly document the

following: negative straight leg raise results; symmetrical and physiological reflexes; and no

weakness or numbness in his extremities. (R. at 20, 22, 518, 520, 523, 527, 534, 536, 540, 544, 547, 560, 563, 570, 576, 653, 665, 657, 1029, 1035, 1051, 1073). These objective findings were largely credited by the ALJ and are inconsistent with a finding of disability under Listing 1.04A. Again, Plaintiff has failed to come forward with evidence demonstrating that he meets *all* of the criteria under Listing 1.04A. *See Johnson*, 263 F. App'x at 202-203. Accordingly, the ALJ's finding at step 3 is supported by substantial evidence and there is no basis to remand for further consideration of this cited listing.

### F. The Vocational Expert's Testimony and the ALJ's Hypothetical

Plaintiff also argues that the ALJ erred by relying on an incomplete hypothetical and disregarding the vocational expert's testimony. (Docket No. 13 at 20-21). Defendant responds that the ALJ did not disregard the vocational expert's testimony. (Docket No 17 at 13). Further, the ALJ was not required to rely on testimony offered in response to a hypothetical which contained limitations which were not credibly established. (*Id.*). Plaintiff's argument lacks merit.

The ALJ properly disregarded testimony by the vocational expert regarding limitations which were not credibly established. When creating hypotheticals, an ALJ is not required to include limitations which are not credibly established or which are in conflict with the medical record. *Lynn v. Colvin*, Civ. A. No. 12-1200, 2013 WL 3854460, at *14 (W.D. Pa. July 24, 2013) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005)). During the hearing, the ALJ posited an individual that needed to be in a reclining position with his legs elevated at work and required more than one sick day per month. (R. at 58). Dr. Cohen testified that such an individual would not be able to engage in light or sedentary work. (*Id.*). This hypothetical reflected Plaintiff's testimony and to some degree the limitations found by Dr. DeMarco, both

of which the ALJ deemed inconsistent with the record as a whole.  (R. at 20-23, 58).  It was within the ALJ's purview to disregard testimony offered in response to a hypothetical which contained limitations that were not credibly established.  Overall, the Court finds that the decision to disregard the cited vocational expert testimony was supported by substantial evidence.  *See Lynn*, 2013 WL 3854460, at *14.

### G.  Plaintiff's Additional Alleged Impairment

Plaintiff's final argument is that the ALJ erred by not discussing a genetic condition with which he was diagnosed after his date last insured of December 31, 2011.  (Docket No. 13 at 22-24).  Defendant counters that even if the condition existed prior to his date last insured, no medical sources have attributed any functional limitations to it, in excess of those assessed in the ALJ's RFC.  (Docket No. 17 at 14).  The Court agrees with Defendant.

Plaintiff was not diagnosed with this genetic condition until February 6, 2012 when he suffered an unprovoked deep vein thrombosis.  (R. at 1073).  This was after Plaintiff's date last insured on December 31, 2011.  (R. at 17).  Plaintiff argues that because it is a genetic condition it was an underlying impairment that existed prior to December 31, 2011.  (Docket No. 13 at 23).  The record does not indicate symptoms from this condition until February 1, 2012 and no medical sources have attributed any vocational limitations to it.  (R. at 1085).  It is well settled that an impairment which did not become disabling until after the claimant's insured status expired cannot establish a claim to benefits.  *Ortega v. Comm'r of Soc. Sec.*, 232 F. App'x. 194, 197 (3d. Cir. 2007) (citing *De Nafo v. Finch*, 436 F.2d 737, 740 (3d Cir. 1971)).  Because Plaintiff has not provided any evidence that his genetic disorder disabled him from working prior to the expiration of his insured status, the ALJ did not err by omitting any discussion of this

condition which could not support an award of DIB benefits.  Therefore, the ALJ's decision is supported by substantial evidence in this regard, as well. *Id.*

## VI.    CONCLUSION

Based upon the foregoing, the ultimate decision by the ALJ to deny benefits to Plaintiff was adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied; Defendant's Motion for Summary Judgment is granted; and the decision of the ALJ is affirmed. Appropriate Orders follow.


<u>*s/ Nora Barry Fischer*</u>
Nora Barry Fischer
United States District Judge


Dated: April 28, 2014
cc/ecf: All counsel of record.